## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARIANN BETH GROSSKINSKY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 12-1348 |
| v. | ) |
| | ) Judge Mark R. Hornak |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**Mark R. Hornak, United States District Judge,**

### I.  INTRODUCTION

Mariann Beth Grosskinsky ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),

seeking review of the final determination of the Commissioner of Social Security ("Defendant"

or "Commissioner") denying her application for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401 – 433, 1381 – 1383f ("Act").  This matter comes before the Court on cross

motions for summary judgment.  (ECF Nos. 9, 12).  The record has been developed at the

administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment will

be DENIED, and Defendant's Motion for Summary Judgment will be GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on March 11, 2009, claiming a disability onset of August 15, 2007. (R. at 208 – 17)[1]. Plaintiff claimed that her inability to work was a result of functional limitation stemming from "back and neck pain." (R. at 230). Plaintiff was initially denied DIB and SSI on May 1, 2009. (R. at 116 – 24). A hearing was scheduled for September 8, 2010, and Plaintiff testified, represented by counsel. (R. at 41 – 78). A vocational expert was also present to testify, as was Plaintiff's mother. (R. at 41 – 78). The Administrative Law Judge ("ALJ") issued her decision denying benefits to Plaintiff on October 28, 2010. (R. at 24 – 40). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on July 18, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 3).

Plaintiff filed her Complaint in this Court on September 25, 2012. (ECF No. 3). Defendant filed an Answer on December 20, 2012. (ECF No. 5). Cross motions for summary judgment followed. The matter has been fully briefed. (ECF Nos. 10, 13, 15, 16).

## III. STATEMENT OF FACTS

### A. General Background

Plaintiff was born on May 30, 1985, was twenty-two years of age at the time of her application for benefits, and was twenty-five years of age at the time of the ALJ's decision. (R. at 226). Plaintiff graduated from high school and received an Associate's Degree to work as a veterinary technician. (R. at 234). Plaintiff's past relevant work included positions as a cashier, kennel worker in a veterinary hospital, and veterinary technician in a veterinary hospital. (R. at 231). Plaintiff lived in a house with her fiancé and two-and-one-half year old daughter. (R. at 46). Plaintiff's mother lived in an adjacent house. (R. at 62). Plaintiff stayed at home to care for

---

[1]     Citations to ECF Nos. 6 – 6-14, the Record, *hereinafter*, "R. at ___."

her daughter following her last period of employment, and subsisted on her fiancé's income. (R. at 34, 131).

In a self-report of functional abilities completed by Plaintiff for the purpose of her application for benefits, Plaintiff indicated that she was her daughter's primary caretaker, she cleaned her residence, she prepared three complete meals per day, she went shopping, she cleaned the laundry, she could walk approximately one mile before needing rest, she drove independently, she spent at least four hours per day outside her home, and she paid her bills and handled her checking/savings accounts. (R. at 245 – 48). Plaintiff also made meals for her fiancé, and cared for two cats. (R. at 246). Plaintiff had no issues with self-care. (R. at 246).

Plaintiff averred that she had daily pain in her back following her pregnancy with her daughter. (R. at 253). Activity worsened the pain. (R. at 253). She stated that her pain woke her up multiple times throughout the night. (R. at 246). She had to sit in certain positions to watch television, and she had to limit playtime with her daughter. (R. at 249). However, at that time, Plaintiff did not take any pain medications. (R. at 254). She had sought treatment from a chiropractor, but had not attempted physical therapy or treatment with a psychiatrist or psychologist. (R. at 254).

Plaintiff indicated that she became easily irritated with other people. (R. at 250). Yet, Plaintiff did not need reminders to go places, she did not require accompaniment to go shopping or attend appointments, she could pay attention for "long periods of time," she finished what she started, she followed instructions "very well," she got along well with authority figures, and she had never lost a job due to problems getting along with other people. (R. at 250 – 51). Plaintiff handled changes in routine "pretty well," and handled stress "as best as possible." (R. at 251).

3

B. Treatment History

Plaintiff began treating with primary care physician Hugh Shearer, D.O. on September 25, 2008. (R. at 274). Plaintiff's initial complaints included depression, lack of motivation, sadness, crying, and sleepiness. (R. at 274). She claimed that anti-depressants had not been helpful for depressive symptoms in the past. (R. at 274). Plaintiff also described experiencing back pain in the area of her thoracic spine that started during her pregnancy six months earlier, but had not improved. (R. at 274). Upon examination, Dr. Shearer observed some tenderness in the mid thoracic spine and paraspinal muscles, but no spasm. (R. at 274). Plaintiff also had intact reflexes. (R. at 274). Dr. Shearer prescribed Celexa and Naprosyn. (R. at 274).

At a follow-up with Dr. Shearer on October 17, 2008, Plaintiff continued to complain of back pain and issues with crying spells and mood swings. (R. at 273). Upon examination, Dr. Shearer noted no weakness, "minimal" tenderness in the thoracic spine, full range of motion, no spasm, and intact reflexes. (R. at 273). Plaintiff had a flat affect, but made good eye contact and interacted appropriately with Dr. Shearer. (R. at 273). Plaintiff was prescribed Prozac and Diclofenac. (R. at 273).

Plaintiff reappeared at Dr. Shearer's offices on October 23, 2008, complaining of rectal bleeding she attributed to her prescription medications. (R. at 272). She still complained of "some thoracic pain," and felt no improvement with medication. (R. at 272). Upon examination, Dr. Shearer found "some tenderness" in the thoracic area, no spasm, and a full range of motion. (R. at 272). He prescribed Ultram instead of Diclofenac and recommended a course of physical therapy. (R. at 272).

On November 14, 2008, Plaintiff was seen by Dr. Shearer for complaints of thoracic pain and depression. (R. at 271). Plaintiff stated that she was depressed and anxious. (R. at 271).

4

She had not been taking her prescribed Prozac for two weeks, however, because of claimed rectal bleeding. (R. at 271). She also complained that pain medication was not helping her, and that she had even taken Vicodin prescribed to her fiancé, but to no avail. (R. at 271). Dr. Shearer observed tenderness between Plaintiff's shoulder blades, but no spasm, radiculopathy, or weakness. (R. at 271). Plaintiff had intact reflexes and full range of motion. (R. at 271). She had a flat affect, but made good eye contact, dressed appropriately, and had normal speech. (R. at 271). Dr. Shearer prescribed Paxil and Mobic. (R. at 271).

Plaintiff sought treatment with chiropractor Ram N. Parikh, D.C. between February 16 and April 2, 2009. (R. at 287 – 301). At his initial evaluation, Mr. Parikh indicated that Plaintiff complained of pain equivalent to 9 on a scale of 1 – 10. (R. at 292). He also observed severe tenderness and muscle spasm in the neck and mid back. (R. at 292). Cervical range of motion was reportedly decreased, as was lumbosacral range of motion. (R. at 292 – 93). Mr. Parikh diagnosed thoracic sprain/strain, muscle spasm, myalgia, and cervical subluxation. (R. at 293). Plaintiff's prognosis was "fair." (R. at 293). Plaintiff saw modest improvement in pain and range of motion through her course of treatment with Mr. Parikh. (R. at 294 – 301).

On April 22, 2009, Plaintiff sought treatment from a new primary care physician, Lisa Guthrie, D.O. (R. at 366). Plaintiff complained of cervical and mid-back pain for approximately two years. (R. at 366). She received some relief by taking Motrin. (R. at 366). However, she claimed that she could not drive and could not stand long enough to wash her dishes. (R. at 366). Plaintiff endorsed experiencing mood swings, but did not believe that she was depressed. (R. at 366). Dr. Guthrie observed that Plaintiff had thoracic kyphosis and was obese. (R. at 366). Her range of motion was decreased. (R. at 366). She prescribed Darvocet, Trazadone, and Xanax. (R. at 366).

5

On April 29, 2009, Plaintiff was evaluated by Ellen Mustovic, M.D. for rehabilitative treatment recommendations with respect to back pain. (R. at 530 – 32). Dr. Mustovic observed Plaintiff to be very pleasant and cooperative. (R. at 532). Plaintiff was overweight, and Dr. Mustovic had difficulty eliciting reflex responses in the upper and lower extremities. (R. at 532). However, Plaintiff had intact sensation and full strength in all extremities, and full range of motion in the cervical spine, shoulders, elbows, and wrists. (R. at 532). She had 75% normal forward flexion in the lumbosacral spine, and increased kyphosis. (R. at 532). Plaintiff's physical examination was otherwise unremarkable. (R. at 531). She had a normal gait. (R. at 532). Plaintiff was diagnosed with degenerative changes and kyphosis of the thoracic spine. (R. at 532). Physical therapy and a rheumatologist consultation were recommended. (R. at 532).

State agency evaluator John Rohar, Ph.D. completed a Psychiatric Review Technique of Plaintiff on May 1, 2009. (R. at 313 – 25). Based upon his review of the medical record, Dr. Rohar concluded that the evidence did not support finding the existence of any severe mental health impairments. (R. at 313 – 25). Plaintiff was indicated as having no more than mild limitations in any functional area. (R. at 323).

On May 5, 2009, Plaintiff returned to Dr. Guthrie for follow-up care. (R. at 365). Plaintiff complained of significant ongoing back pain. (R. at 365). She also described experiencing anxiety and panic attacks. (R. at 365). Plaintiff's medications were adjusted. (R. at 365). Findings were relatively the same at a June 16, 2009 return examination. (R. at 364). Diagnostic testing revealed that Plaintiff had normal bone density in her lumbar spine and hip. (R. at 367, 379). She had minimal facet joint sclerosis in the lumbar spine, and disc spaces were well-maintained. (R. at 368). Kyphosis and mild scoliosis of the thoracic spine was demonstrated in imaging studies, as were diffuse degenerative changes and loss of stature of

6

multiple mid-thoracic vertebral bodies. (R. at 369). An x-ray of the entire spine showed that there was no fracturing, no swelling of prevertebral soft tissues, and disc spacing was generally well-maintained. (R. at 370 – 71). A CT scan of Plaintiff's brain was also normal. (R. at 376).

Plaintiff began seeking treatment from rheumatologist Devashis A. Mitra, M.D. on June 24, 2009 for complaints of ongoing back pain. (R. at 347). Upon initial evaluation, Dr. Mitra observed Plaintiff to be alert and oriented, and in no acute distress. (R. at 347). Tenderness was noted in the paraspinal muscles of the thoracic and lumbar spine, as was some muscle spasm. (R. at 347). Plaintiff was otherwise unremarkable and was not considered to have a connective tissue disease. (R. at 347). Dr. Mitra diagnosed osteoarthritis of the thoracic and lumbar spine. (R. at 347). She was to follow up with Dr. Mitra.

Plaintiff was first evaluated for physical therapy at Butler Memorial Hospital's Department of Rehabilitation Services on July 28, 2009. (R. at 342). Plaintiff's score on a back pain questionnaire indicated that she had moderate disability. (R. at 342). She complained of pain that ranged from 2 – 8 on a scale of 1 – 10. (R. at 342). She could walk no more than a mile and sit no more than an hour. (R. at 342). She could stand as long as she wanted, but with increased pain. (R. at 342). Activity increased Plaintiff's pain, but medication and relaxation relieved her pain. (R. at 342). No tenderness was noted upon palpation by the physical therapist, and straight leg-raising tests were negative. (R. at 342). Plaintiff was observed to have moderate thoracic kyphosis and exaggerated lumbar lordosis. (R. at 342). In a physical therapy progress note dated September 1, 2009, Plaintiff was noted to be progressing. (R. at 344). Plaintiff ultimately attended thirteen sessions, but was discharged from physical therapy on November 19, 2009 after failing to appear at four consecutive appointments. (R. at 523). Plaintiff had met "some goals," and reported "better" overall pain. (R. at 523).

7

On August 3, 2009 Plaintiff returned for treatment with Dr. Mitra. (R. at 348). Plaintiff continued to complain of moderate to severe mid back pain. (R. at 348). There was no joint swelling, radicular pain, numbness, or weakness, however, and only minimal fatigue and mild stiffness. (R. at 348). Plaintiff stated that her medications did not provide relief. (R. at 348). Physical examination revealed non-tender joints without inflammation, paraspinal spasm, and adequate range of motion. (R. at 348). Dr. Mitra diagnosed osteoarthritis of the thoracic and lumbar spine, and prescribed Ketoprofen and Parafon. (R. at 348).

Between August 21, 2009 and March 18, 2010, Plaintiff sought mental health treatment at the Irene Stacy Community Mental Health Center in Butler, Pennsylvania. (R. at 408 – 17). Patricia Jarrett, M.D. completed an initial psychiatric evaluation. (R. at 414 – 17). Plaintiff reported an onset of depression three years prior. (R. at 414). She complained of being down and overeating for comfort. (R. at 414). She complained of low energy, low motivation, anhedonia, and irritability. (R. at 414). She claimed that she experienced panic attacks and was otherwise easily upset, and that this problem was worsening. (R. at 414). Plaintiff denied agoraphobia. (R. at 414). She did not believe that psychiatric medications provided much help. (R. at 414).

Dr. Jarrett observed Plaintiff to be clean, neat, and casually dressed, she made good eye contact, was pleasant, was cooperative, was alert, had normal rate and rhythm of speech, had organized and goal-directed thoughts, had depressed mood, had constricted affect, had good judgment, had fair insight, had good attention, had a good fund of knowledge, and had intact memory. (R. at 415). Physically, Plaintiff had a normal gait and no abnormal motor movements. (R. at 415). Dr. Jarrett concluded that Plaintiff's prognosis was fair to good, and that she would require one to three years of therapy. (R. at 416). Plaintiff was diagnosed with

8

major depressive episode, generalized anxiety disorder, and panic disorder without agoraphobia. (R. at 417). Dr. Jarrett assigned a global assessment of functioning ("GAF") score of 45[2]. (R. at 417).

Plaintiff's first progress note from Dr. Jarret on September 18, 2009 indicated that Plaintiff felt "not too bad," that her mood was "better," her sleep was "improved," and her anxiety had decreased. (R. at 412). Dr. Jarrett observed Plaintiff to be clean, to have normal speech, to have organized thoughts, to be alert and oriented, to be cooperative, and to have euthymic mood. (R. at 412). Plaintiff was engaged in counseling, as well. (R. at 412). Plaintiff was making "moderate" progress. (R. at 412).

On October 6, 2009, Plaintiff reported to Dr. Mitra that the severity of her mid back pain had improved. (R. at 349). While Plaintiff was noted to continue to experience paraspinal spasm, her back condition was considered to be stable, and there were no other significant changes from Plaintiff's previous visits. (R. at 349 – 50). Plaintiff's diagnoses included thoracic spondylosis without myelopathy and lumbosacral spondylosis without myelopathy. (R. at 350).

Also on October 6, 2009, Plaintiff returned for a follow-up appointment with Dr. Guthrie. (R. at 361). At that time it was noted that physical therapy and treatment with a rheumatologist had helped Plaintiff's pain. (R. at 361). Counseling was helping her mental health issues, and she was "less edgy overall." (R. at 361).

On October 20, 2009, Dr. Jarrett completed another psychiatric progress note, and indicated therein that Plaintiff reported feeling "not too bad." (R. at 411). Plaintiff stated that

---

[2]      The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

9

her mood was "ok." (R. at 411). Dr. Jarrett observed Plaintiff to be clean, to have normal speech, to have organized thoughts, to be alert and oriented, to be cooperative, and to have euthymic mood. (R. at 411). Plaintiff was making "moderate" progress. (R. at 411).

While Plaintiff saw some worsening of her mental state in February 2010, by March 2010 Plaintiff stated that she felt "alright." (R. at 408 – 09). Her mood and anxiety were improving. (R. at 408). Dr. Jarrett observed Plaintiff to be clean, to have normal speech, to have organized thoughts, to be alert and oriented, to be cooperative, and to have euthymic mood. (R. at 408). Plaintiff was noted to have made "minimal" progress, but Dr. Jarrett also opined that she believed Plaintiff to be "oversedated" on her medication regimen. (R. at 408).

In October and November 2009, Dr. Guthrie noted that Plaintiff's mood was "ok overall," and that physical therapy was helping Plaintiff's back pain. (R. at 534 – 35, 559). Plaintiff was also sleeping better. (R. at 534 – 35, 559). Plaintiff's medications were adjusted. (R. at 534 – 35, 559).

On March 22 and June 29, 2010 Plaintiff again sought treatment with chiropractor Ram N. Parikh. (R. at 406, 538 – 56). Despite initial reports of severe pain and significant limitation of activities of daily living, Plaintiff's prognosis was "good." (R. at 538, 541). Physical examinations revealed moderate pain and spasm in Plaintiff's back. (R. at 406, 538 – 56). Improvement in Plaintiff's condition was typically noted. (R. at 406, 538 – 56).

On May 20, 2010, Dr. Jarrett completed a psychiatric progress note and stated that Plaintiff felt "not too bad." (R. at 536). Plaintiff's mood was "stable," and her anxiety was "better." (R. at 536). Plaintiff denied medication side effects, her appearance was clean, her speech was normal, her thoughts were organized, she was alert and oriented, she was cooperative, and her mood was euthymic. (R. at 536). Plaintiff's improvement was noted to be

10

"moderate." (R. at 536).

Plaintiff's last treatment note from Dr. Guthrie was dated August 10, 2010. (R. at 558). Plaintiff's anxiety and depression were noted to have improved with counseling. (R. at 558). Plaintiff had continuing back pain, however, and claimed that she could not stand for any period. (R. at 558). Plaintiff's medications were adjusted. (R. at 558).

Plaintiff was also treated by pain management specialist Hairong Peng, M.D. from July through September 2010. (R. at 567 – 75). Plaintiff was initially evaluated by Dr. Peng on July 1, 2010. (R. at 572 – 75). At that time, Plaintiff complained of mid-to-upper back pain that was typically 6 on a scale of 1 – 10. (R. at 572 – 75). The pain started after Plaintiff became pregnant. (R. at 572 – 75). The pain was constant, could radiate into the extremities and cause cramping and tenderness around the spine, and affected walking, sitting, lifting, bending, sleeping, and daily activities. (R. at 572 – 75). Lying down, medication, and relaxation relieved Plaintiff's pain. (R. at 572 – 75). Plaintiff claimed that chiropractic treatment, exercise, and physical therapy did not provide lasting relief, and neither did most past prescribed medications. (R. at 572 – 75).

Upon examination, Dr. Peng observed Plaintiff to be pleasant and in no acute distress. (R. at 572 – 75). Plaintiff made appropriate eye contact, answered questions appropriately, displayed no overt pain behaviors, comfortably sat, and was able to rise from a seated position with the assistance of her arms. (R. at 572 – 75). While Plaintiff's gait was antalgic, it was without ataxia, and she had normal muscle tone and bulk, full strength in all extremities, preserved reflexes in all extremities, and intact sensation in all extremities. (R. at 572 – 75). Dr. Peng ultimately suspected the presence of thoracic degenerative disk disease, spinal stenosis, and myofascial pain syndrome. (R. at 572 – 75). Dr. Peng suggested steroid injections, trigger point

11

injections, medication, counseling, physical therapy, and exercise. (R. at 572 – 75). Plaintiff was prescribed MS Contin and was to have an MRI of her spine. (R. at 572 – 75).

Plaintiff was seen again by Dr. Peng on August 13, 2010. (R. at 567 – 68). Plaintiff complained of slightly increased pain at 7 on a scale of 1 – 10. (R. at 567 – 68). Dr. Peng noted that the results of an MRI of Plaintiff's spine revealed old, healed compression fractures to the thoracic spine, a central disk protrusion herniation at the T7 – T8 level of the thoracic spine which mildly flattened the anterior margin of the thoracic cord, and mild disk bulging at multiple levels. (R. at 567 – 68). Upon examination, Dr. Peng's observations of Plaintiff remained the same, except that he also indicated that she was able to heel and toe walk well, and could squat without difficulty. (R. at 567 – 68). He concluded that Plaintiff's pain was secondary to discogenic syndrome. (R. at 567 – 68). He changed her MS Contin prescription to Opana ER. (R. at 567 – 68).

On September 10, 2010, Plaintiff returned to Dr. Peng for a follow-up examination. (R. at 569 – 71). Her complaints were largely the same, but her pain had returned to 6 on a scale of 1 – 10. (R. at 569 – 71). Plaintiff claimed that her pain medication did allow her to maintain some degree of functioning. (R. at 569 – 71). She denied medication side effects. (R. at 569 – 71). Upon examination, Dr. Peng's personal observations of Plaintiff remained the same as before. (R. at 569 – 71). Additionally, he noted that straight leg-raising testing was negative, as was a Patrick's test. (R. at 569 – 71). There was no gross deformity of the lumbar or thoracic spine, although there was some tenderness. (R. at 569 – 71). Dr. Peng believed Plaintiff to experience thoracic degenerative disk disease and compression fractures. (R. at 569 – 71). He prescribed Opana ER, and his treatment recommendations otherwise remained the same. (R. at 569 – 71).

12

## C. Administrative Hearing

At her hearing, Plaintiff testified that she did not believe she could work a full-time job due to the number of breaks that she needed to take during her day to relieve pain. (R. at 54). The primary source of Plaintiff's pain was her back, specifically her upper-middle back, with pain radiating into her lower back on bad days. (R. at 51 – 52). She stated that she had experienced back pain since she was nine or ten years of age, but that it had not been problematic until she became pregnant. (R. at 53). On average, she rated her pain as 7 on a scale of 1 – 10. (R. at 52). Plaintiff claimed that she obtained the greatest degree of relief from reclining in a chair with a heating pad, and would need to rest for approximately twenty minutes at a time. (R. at 52). Physical activity made the pain worse. (R. at 52). Physical therapy and medication helped Plaintiff's pain. (R. at 54). Nevertheless, Plaintiff asserted that she could sit or stand for only twenty to thirty minutes at a time. (R. at 47, 62). She could lift no more than twenty pounds. (R. at 62). Plaintiff maintained a driver's license and could drive for only limited periods due to pain. (R. at 46 – 47). Plaintiff's mother relocated from Pittsburgh to Butler, where Plaintiff lived, to help Plaintiff with her daughter on days when her pain was severe. (R. at 56 – 57, 62 – 63, 65).

Plaintiff also complained of psychological issues that limited her functionality. While never psychiatrically hospitalized, Plaintiff claimed to experience frequent depression and anxiety. (R. at 50). She described experiencing panic attacks approximately every other week, and had difficulty being in crowded spaces. (R. at 50). Plaintiff claimed that her concentration was affected by the attacks. (R. at 51). She generally preferred to stay in her home, and became irritable if she had to leave to go grocery shopping. (R. at 50). Plaintiff did not pursue counseling until August 2009, however. (R. at 51).

13

A typical day for Plaintiff involved waking at 7:00 a.m. with her fiancé and making his lunch, returning to bed until 9:00 or 9:30 a.m. when her daughter woke, making breakfast, performing back stretching exercises, and then reclining in a chair for approximately half an hour. (R. at 47 – 48). After resting, Plaintiff would spend her day attending doctors' appointments or cleaning the house. (R. at 46, 48). She would take multiple breaks throughout the day to rest, usually reclining in a chair with a heating pad for fifteen to twenty minutes at a time. (R. at 48). On bad days, she would spend most of the day reclining or lying down. (R. at 63). This could occur as often as three times per week. (R. at 63). In the evening, Plaintiff would prepare dinner, and when her fiancé returned from work, he would either finish cooking for Plaintiff or would take over caring for Plaintiff's daughter. (R. at 48). Plaintiff explained that the dinners she prepared did not involve intensive supervision or standing for long periods. (R. at 48). After dinner, she and her fiancé would relax, she would wash dishes, and they would go to bed around 10:00 p.m. (R. at 48 – 49).

Plaintiff's mother, Patricia Charles, testified after Plaintiff. She stated that she had to help Plaintiff three or four times per week due to pain. (R. at 65). This help included caring for Plaintiff's daughter and lifting items for Plaintiff. (R. at 65, 68 – 69). Ms. Charles indicated that Plaintiff complained of back pain on a daily basis. (R. at 65). Approximately once per week Ms. Charles had to help Plaintiff with a panic attack. (R. at 66). Plaintiff visited her mother's house almost every day of the week with her daughter, and would "just lay around and watch TV." (R. at 67).

Following the testimony of Plaintiff and Ms. Charles, the ALJ sought the vocational expert's testimony. The ALJ first asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work history would be able to engage in full-time

14

work existing in significant numbers in the national economy if limited to sedentary work which provided a sit/stand option and involved no more than simple, routine tasks that are not performed in a fast paced production environment. (R. at 71). The vocational expert responded that such a person could sustain employment as a "document preparer," with 124,000 positions available in the national economy, or as a "surveillance system monitor," with 115,000 positions available, and could work in "telephone service," with 72,000 positions available. (R. at 72).

The ALJ went on to ask whether the same hypothetical individual could still work full-time if he or she required frequent breaks totaling one or two hours duration every work day. (R. at 72). The vocational expert replied that such a person would not be able to work. (R. at 72). The vocational expert further testified that missing more than one day of work per month would also preclude substantial gainful activity. (R. at 74 – 75).

## IV.   STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler*, 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt.

15

404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 800 (W.D. Pa. 2012) (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999)). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of

---

[3]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4]     Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

16

fact. *Gaddis v. Comm'r of Soc. Sec.*, 417 F. App'x 106, 107 n. 3 (3d Cir. 2011) (citing *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002)).

Substantial evidence is defined as "'more than a mere scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion. *Hagans v. Comm'r of Soc. Sec.*, 694 F. 3d 287, 292 (3d Cir. 2012) (quoting *Plummer v. Apfel*, 186 F. 3d 422, 427 (3d Cir. 1999)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Id.* (citing *Fargnoli v. Massanari*, 247 F. 3d 34, 38 (3d Cir. 2001)); 42 U.S.C. § 405(g). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Gamret v. Colvin*, 2014 WL 109089 at *1 (W.D. Pa. Jan. 10, 2014) (citing *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947)). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, even where this court acting *de novo* might have reached a different conclusion, "so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Medical Center v. Sebelius*, 566 F. 3d 368, 373 (3d Cir. 2009) (quoting *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1191 (3d. Cir. 1986)).

## V. DISCUSSION

In her decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairment in the way of major depressive disorder, generalized anxiety disorder, panic disorder, and obesity. (R. at 29). As a result of said impairments, the ALJ found that Plaintiff would be

17

limited to sedentary work providing a sit/stand option, and involving no more than simple, routine tasks not performed in a fast-paced production environment. (R. at 31). Based upon the testimony of the vocational expert, the ALJ determined that Plaintiff was capable of engaging in a significant number of jobs in existence in the national economy. (R. at 35 – 36). Plaintiff was not, therefore, awarded benefits. (R. at 36).

Plaintiff objects to the decision of the ALJ, arguing that she erred in failing to give sufficient credit to the findings of Plaintiff's treating medical sources, in failing to accord proper weight to Plaintiff's subjective complaints of pain and limitation, and in failing to adequately accommodate all of Plaintiff's credibly established medical limitations in her RFC assessment and hypothetical question to the vocational expert. (ECF No. 13 at 11 – 19). Defendant counters that the ALJ provided substantial evidence to support her decision, and should be affirmed. (ECF Nos. 10, 15). The Court agrees with Defendant.

A. Physician Opinions

Plaintiff initially asserts that the opinions of her treating physicians, including statements demonstrating the existence of severe functional limitation, were disregarded by the ALJ. (Docket No. 13 at 11 – 14). It has long been established that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)). However, "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*,

667 F. 3d 356, 361 (3d Cir. 2011) (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)). A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Brownawell*, 554 F. 3d at 355. Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record. *Plummer*, 186 F. 3d at 430 (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)).

Presently, Plaintiff makes numerous broad and generally unsupported claims that "many treating physicians...indicate very severe impairments," including Dr. Shearer, Dr. Guthrie, Dr. Mitra, and Dr. Peng. (Docket No. 13 at 12). Plaintiff allegedly only ever experienced "temporary" pain relief, was provided "very strong pain medication," and had a pain level of "7/10." (*Id.*). These claims notwithstanding, Plaintiff fails to point to any statement by the above-mentioned doctors to the effect that Plaintiff was unable to work due to her physical and mental impairments. None of these doctors indicated that Plaintiff had *any* specific functional limitations, aside from recording her own personal, subjective complaints. *See Morris v. Barnhart*, 78 F. App'x 820, 821 (3d Cir. 2003) ("[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion.").

The ALJ correctly noted that in spite of Plaintiff's complaints of pain and limitation, the doctors regularly found that she had generally full range of motion, no motor losses, no muscle atrophy or weakness, no sensory loss, and no loss of reflexes. (R. at 30, 32 – 34). Both Plaintiff's physical therapist and Dr. Peng indicated that straight leg-raising tests were negative. (R. at 30, 33, 342, 569 – 71). Plaintiff generally saw improvement in her symptoms through medication and physical therapy. (R. at 32 – 34). Treatment recommendations beyond

19

medication, exercise, physical therapy, and pain injections were never made. (R. at 32 – 34). Contrary to Plaintiff's claims, no treating physician opined that Plaintiff had severe pain or limitation, beyond recording Plaintiff's subjective claims. (R. at 32 – 34). Dr. Peng never witnessed pain behavior by Plaintiff in examinations. (R. at 32 – 34). Tenderness observed by doctors during physical examination was never indicated to be severe. (R. at 32 – 34). Plaintiff's belief that the medical evidence demonstrates significant inability to sit and stand, and an alleged need to recline for substantial periods of the day, is inaccurate. Plaintiff informed her gynecologist that she regularly walked for exercise. (R. at 33, 392). Several parts of the record included Plaintiff's statement that she could walk for approximately one mile. (R. at 32 – 34). In Plaintiff's most recent treatment records, Dr. Peng regularly noted that Plaintiff sat comfortably throughout every examination, and he also noted that she could heel and toe walk, squat, and rise from a seated position without difficulty. (R. at 32 – 34, 567 – 75).

The determination of disabled status for purposes of receiving benefits – a decision reserved for the Commissioner, only – will not be affected by a medical source simply because it states that a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Here, however, no such statements regarding disability were ever made by any treating physicians, let alone reports of objective observations consistent with Plaintiff's personal complaints. Plaintiff claims that the ALJ failed to base his decision on physician evidence; to the contrary, Plaintiff cited to no physician-supplied evidence of limitation in line with the severity of her claimed limitations. As such, the ALJ's handling of Plaintiff's treating physicians with respect to physical limitations was proper.

As to Dr. Jarrett's one-time assessment of a GAF of 45, the Court finds that the ALJ properly declined to accord this score significant weight. The United States Court of Appeals for

the Third Circuit has held that a "GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." *Bracciodieta-Nelson v. Comm'r of Soc. Sec.*, 782 F. Supp. 2d 152, 165 (W.D. Pa. 2011) (quoting *Gilroy v. Astrue*, 351 F. App'x 714, 715 – 16 (3d Cir. 2009)). "[W]hile GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability." *Id.* (citing *Coy v. Astrue*, 2009 WL 2043491 at *14 (W.D. Pa. Jul. 8, 2009)). A single GAF score cannot alone establish disability, and need not even be discussed when the assigning physician made no specific limitations findings or otherwise failed to explain the basis for the score, and the ALJ discussed the physician's narrative, objective reports. *Id.* (citing *Coy*, 2009 WL 2043491 at *14; *Gilroy*, 351 F. App'x at 716).

In this case, while the ALJ did not specifically discuss the import of the GAF score of 45, she did note that Dr. Jarrett's progress notes – while indicative of the presence of depression and anxiety – generally included relatively normal mental status evaluation findings, including being alert and oriented, and demonstrating normal speech, organized thoughts, no delusions, and no suicidal ideation. (R. at 32). Plaintiff, herself, typically stated that she felt "not too bad," and she generally made progress in treatment. (R. at 32). This is a far cry from the type of debilitating, severe mental health-related limitations claimed by Plaintiff. Dr. Jarrett never made specific functional limitations findings, never opined on Plaintiff's ability to work, and never explained the basis for her GAF score of 45 and whether or not it was supposed to indicate Plaintiff's degree of work-related limitation. As such, the Court finds no error in the ALJ's treatment of Dr. Jarrett's GAF score of 45 or her associated progress notes.

B. Credibility

Plaintiff next argues that her claimed need to lie down and recline frequently throughout the day to alleviate pain, her inability stand or sit for more than thirty minutes, her inability to walk more than a city block and lift more than twenty pounds, and her periodic numbness in her hands and panic attacks in public was not adequately credited by the ALJ in her discussion of Plaintiff's medical history. (Docket No. 13 at 17 – 18; R. at 30). Plaintiff states that "there is absolutely no medical evidence whatsoever supporting a conclusion that Plaintiff does not have severe pain." *(Id.* at 18).

An ALJ should accord subjective complaints of pain and limitation similar treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 122 (3d Cir. 2000). Serious consideration must be given to subjective complaints where a medical condition could reasonably produce claimed pain or limitation. *Mason v. Shalala*, 994 F. 2d 1058, 1067-68 (3d Cir. 1993). In so doing, the ALJ is required to assess the intensity and persistence of a claimant's pain and limitation, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999). This, however, includes determining the accuracy of a claimant's subjective complaints. *Id.* While pain itself may be disabling, and subjective complaints may support a disability determination, allegations must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F. 2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F. 3d at 122.

The Court first notes that Plaintiff cites no treating medical source to support any of her claimed limitations. Plaintiff's treatment history consisted of medication management and counseling and she was regularly noted to make progress. (R. at 32 – 34). Although Plaintiff claimed to have issues with panic in public, Dr. Jarrett stated that Plaintiff did not have

22

agoraphobia. (R. at 32 – 34). Plaintiff also provided in her own self-report that she frequently interacts with family, gets along with authority figures, and would leave the house for four hours per day. (R. at 33). Plaintiff was noted throughout the record to be pleasant and cooperative, and no inappropriateness in behavior was indicated. (R. at 32 – 34). Dr. Jarrett made no limitations findings, and made no statements about Plaintiff's ability to work for psychological reasons.

Similarly, while diagnostic imagining studies certainly revealed the existence of abnormalities in Plaintiff's spine, there were no objective findings by any treating physician that Plaintiff could not work due to physical ailments. Plaintiff's doctors prescribed medication, exercise, physical therapy, and injections for pain. (R. at 32 – 34). Treating physicians, physical therapists, and a chiropractor noted that pain improved with treatment. (R. at 32 – 33). Dr. Peng noted that Plaintiff had no issues with sitting, rising, squatting, and heel and toe walking. (R. at 32 – 34). Plaintiff was regularly noted to have full strength and intact sensation in her extremities. (R. at 32 – 34). Plaintiff informed her gynecologist that she walked regularly for exercise. (R. at 32 – 34). There was also a significant disparity between the activities of daily living discussed by Plaintiff in her own self-report – including meal preparation, full-time care of her young daughter, cleaning, and walking – and what she later claimed in her hearing testimony. (R. at 32 – 34).

Plaintiff provides this Court with little evidence of consistency between Plaintiff's complaints of pain and limitation and objective medical findings from treating sources. This lack of consistency is a proper basis for denying subjective complaints full credibility. Moreover, credibility determinations are the province of the ALJ and only should be disturbed

23

on review if not supported by substantial evidence. *Jones v. Barnhart*, 364 F. 3d 501, 503 (3d Cir. 2004). The Court finds the ALJ's credibility determination so supported.

## C. Hypothetical Question/ RFC Assessment

Lastly, Plaintiff claims that she and her mother's testimony about her need to recline and take frequent breaks and her panic attacks in public places necessitated the provision of additional limitations in the ALJ's hypothetical question and RFC assessment. (Docket No. 13 at 14 – 17). Hypothetical questions and RFC assessments "must accurately convey...all of a claimant's credibly established limitations." *Young v. Comm'r of Soc. Sec.*, 322 F. App'x 189, 191 (3d Cir. 2009 (quoting *Rutherford v. Barnhart*, 399 F. 3d 546, 554 (3d Cir. 2005)). Yet, the ALJ need not include limitations which are unsupported by "medically undisputed evidence in the record." *Id.* (quoting *Burns v. Barnhart*, 312 F. 3d 113, 123 (3d Cir. 2002)). Additionally, limitations which are in conflict with the medical record are not required to be included. *Lynn v. Colvin*, 2013 WL 3854460, \*14 (W.D. Pa. July 24, 2013) (citing *Rutherford*, 399 F.3d at 554).

In light of the above discussion, it is clear that the ALJ provided a sufficient analysis of the medical evidence underlying Plaintiff's claim for disability benefits. Having provided adequate record evidence to support her ultimate factual findings, this Court can conclude nothing other than that all the credibly established medical impairments suffered by Plaintiff were properly incorporated into the hypothetical to the vocational expert and were accommodated fully in the ALJ's RFC assessment. Therefore, substantial evidence supported the ALJ's decision in this regard.

## VI. CONCLUSION

Based upon the foregoing, the ALJ engaged in sufficient discussion of the factual record to provide substantial evidence in support of his ultimate disability decision. Accordingly,

Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment

is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

Mark R. Hornak
United States District Judge

Dated: March 19, 2014
cc/ecf: All counsel of record.